*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0599**

In the Matter of the Civil Commitment of:  William Iverson

**Filed October 17, 2016
Affirmed
Connolly, Judge**

Washington County District Court
File No. 82-PR-08-3466

William Richard Iverson, St. Peter, Minnesota (pro se appellant)

Lori Swanson, Attorney General, Marsha E. Devine, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Connolly, Presiding Judge; Worke, Judge; and Ross, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CONNOLLY**, Judge

Appellant, pro se, challenges the district court's order providing for the involuntary administration of neuroleptic medications, arguing that he is not mentally ill and does not need treatment.  Because the district court's findings are not clearly erroneous, we affirm.

**FACTS**

Appellant William Iverson, born in 1955, was convicted of the second-degree murder of his wife and incarcerated from 1983 to 1991. In 1997, he was convicted of the first-degree assault of his former fiancée and again incarcerated. In 2009, while incarcerated, he was committed as mentally ill and dangerous (MI&D) and transferred to the St. Peter Regional Treatment Center/Minnesota Security Hospital (SPRTC/MSH). Appellant has received psychiatric treatment, including neuroleptic medications, intermittently since 1999, and a number of *Jarvis* orders have been issued to provide for the involuntary administration of his neuroleptic medications for a two-year period.[1]

At the hearing on the 2016 petition for another *Jarvis* order authorizing appellant's involuntary treatment with neuroleptic medication, three people testified: the psychiatrist who petitioned for the *Jarvis* order (the petitioner), another psychiatrist (the psychiatrist), and appellant.

**The Petitioner's Testimony**

The petitioner testified that appellant's diagnosis was schizoaffective disorder, "a chronic, lifelong, psychotic disorder that involves thought disorganization, delusions, hallucinations and other psychotic features. . . . and also involves a mood component." He added that "There is no effective treatment for psychotic symptoms other than neuroleptic medications." When asked for appellant's symptoms, he said:

---

[1] *See Jarvis v. Levine*, 418 N.W.2d 139, 148-49 (Minn. 1988) (providing that medical authorities seeking to treat a patient involuntarily with neuroleptic medications must first obtain court approval).

> [Appellant] has delusional thoughts. He has some delusional beliefs. He also demonstrates other psychotic features including disorganization of thoughts, hallucinating associations [, . . . and] delusional ideas. . . [such as] that he has been ordained as a minister of his own religion and that God spoke to him and said that he was the minister of Shinto Islam.

The petitioner added that he had been unable to find any reference to Shinto Islam on the Internet. When asked for an example of appellant's thought-disorder issues, he said that, in appellant's writings, "we will see a lot of tangential references to things that seem unrelated to the topic of the writing" such as "talking about a bear watching him while he was fishing."

The petitioner explained that, although no *Jarvis* order was then in effect, appellant was still taking a non-therapeutic dose of Seroquel, a neuroleptic medication, because it helps him sleep. The petitioner's view was that "it would be riskier for [appellant] to stop taking the Seroquel at this time than it would be for him to continue taking it. It would be potentially detrimental to his mental health if I were to stop the Seroquel abruptly." The petitioner said that appellant had not been willing to talk about taking other medications during their last three visits.

When asked if appellant could "advance from a psychiatric point of view" in his treatment without neuroleptic medication, the petitioner answered, "His psychotic condition would not improve at all . . . ." The petitioner testified that, although appellant believes he should not take neuroleptic medications "because of the head injury that he incurred many years ago," long-term head injuries were not a contraindication of antipsychotic medications; moreover, a recent MRI scan of appellant's brain revealed no

structural abnormalities. When asked if appellant's refusal "to take other neuroleptic medications interfere[d] with his treatment at this time," the petitioner answered, "Yes." The petitioner also said he was not aware of any religious objections appellant had to taking the medications.

When asked if he believed that appellant had the capacity to refuse to try other medications, the petitioner said appellant did not have the capacity, "because the medications potentially would have immense benefits to his mental health and could help him to have a better clinical outcome, including being able to obtain a provisional discharge much sooner." When asked for the basis of his belief that appellant lacked capacity, the petitioner replied, "[f]undamentally [appellant] does not understand that he has mental illness at all and when one doesn't understand that [he is] sick, [he does] not want to accept treatment for a condition that [he doesn't] believe [he has]."

**The Psychiatrist's Testimony**

The psychiatrist testified that: (1) he was the court-appointed examiner; (2) because appellant believed he was biased, appellant had been unwilling to meet with him prior to the hearing; (3) he had evaluated appellant in 2009; diagnosed schizoaffective disorder, bipolar type; reviewed appellant's records; and seen a pattern in 2001, 2008, and 2012. He described the pattern:

> [Appellant's] symptoms would worsen to the point where he would get committed and have imposed treatment and then improve. And unfortunately he would improve enough that he then became someone who was thought to have the capacity to say yes or no to medications . . . . [U]sually that gave him the opportunity to start to ween [himself off of] his medications and then the process would start again.

4

The psychiatrist further explained, "Although [appellant] has times when he infrequently has believed he has had a mental illness, he generally does not believe that and then it's during those times that he chooses to decrease the medication slightly and that's when the kind of slippery slope begins." When asked for his opinion on whether antipsychotic medications were medically indicated and were the least restrictive means of treating appellant's mental illness, he answered, "My opinion is that it would be indicated and appropriate and that at this point imposed treatment seems to be the least restrictive way to bring about treatment."

**Appellant's Testimony**

Appellant testified that, after the last *Jarvis* order expired in April 2014, he stayed on Seroquel because it helped him sleep and that "at this point in time today I don't feel I'm at a point where I have a mental illness." Appellant's counsel then asked him about the request for a *Jarvis* order.

| | |
|---|---|
| Counsel: | Why do you think it's not a proper request? |
| Appellant: | Because of the situational factor of my TBI [traumatic brain injury], which is a unique brain damage. And the effects of Seroquel over the years and years and years. And going off Seroquel is the sleep effect I have on Seroquel and my compliance on taking that medication of being, having numerous providers, mental health providers that prescribed dosages at different levels and different dosages which [I] have gone through. And more or less the trouble I had in the DOC [Department of Corrections] and why I had so many *Jarvises* in Washington County Court. |
| Counsel: | So are you not willing to take a higher dosage of Seroquel? |

5

| | |
|---|---|
| Appellant: | I would rather leave it like it is because I still get up a little bit of pain but I still work through the day. I would like a cap on it . . . and that is why I'm seeking review in the Appellate Court because it is coming up to 19 years of straight confinement for me. |
| Counsel: | Are you not willing to try other neuroleptic medications? |
| Appellant: | I have gone through numerous other medications . . . . |

. . . .

| | |
|---|---|
| Counsel: | Are you willing to try those [other] medications? |
| Appellant: | Not at this time. |

. . . .

| | |
|---|---|
| Counsel: | Are you opposing the use of any other neuroleptic medications because of your religion? |
| Appellant: | I brought this up before, maybe in a *Jarvis* or Court and some of my writings that low dosages of Seroquel or of other dosages of different meds, I am not sure, and I have gone through them and had side effects, but with Seroquel I have no objection to a low dosage with my religion, but a high dosage of Seroquel or others, I do feel that it is against my religion. |

Appellant's counsel questioned him again on redirect examination.

| | |
|---|---|
| Counsel: | You indicated that you don't believe that you suffer from mental illness at this time, is that what you said? |
| Appellant: | That's correct. |
| Counsel: | Do you think you exhibited some symptoms of mental illness in the past? |
| Appellant: | Describing the TBI and effects of the neuroleptics it would have seemed to. |
| Counsel: | And how do you deal with those symptoms? |
| Appellant: | I wrote to the Court . . . and I gave them a list of witnesses. |
| Counsel: | Okay. I don't mean legally, I mean for yourself, how did you deal with your own symptoms of mental illness? |

6

> Appellant: My own symptoms of mental illness is I . . . more or less don't believe I have any.
>
> Counsel: Ever?
>
> Appellant: No. I traded it in, I just don't feel I have anything going on except for supporting my peers because [of] my ability to address myself in court and redress my issues. And my past behavior was anger, expressing my anger inappropriately.[2] But I believe I have had . . . close to 10,000 therapy groups and at least 500 anger management groups to where I can express my anger appropriately now. And as long as I can do that verbally in a nonaggressive manner, there is no mental illness really in my record except for violence. And then it seems like it was precluded to a mental illness by this report, this report, this report, and I tried to address them on appeals and I continue to do that.

The district court made findings based on this and other testimony, concluded that "the issuance of this *Jarvis* [o]rder is proper in light of the evidence," and granted the petition for a *Jarvis* order. Appellant challenges the granting of the petition, arguing that the district court's findings are clearly erroneous.

### D E C I S I O N

"We review the record in the light most favorable to the district court's decision . . . [and w]e will affirm the district court's findings unless they are clearly erroneous." *In re Civil Commitment of Raboin*, 704 N.W.2d 767, 769 (Minn. App. 2005) (citation omitted). "Where the findings of fact rest almost entirely on expert testimony, the [district] court's

---

[2] As previously stated, appellant was convicted of the second-degree murder of his wife and the first-degree assault of his ex-fiancée. Both crimes were committed by stabbing the victims, and appellant regards the stabbing as an inappropriate expression of anger.

evaluation of credibility is of particular significance." *In re Knops*, 536 N.W.2d 616, 620 (Minn. 1995).

> Patients subject to civil commitment are presumed to have the capacity to make decisions regarding the administration of neuroleptic medication. If a patient refuses such treatment and the district court finds that the patient lacks the capacity to make that decision, the district court may authorize the treating facility to administer neuroleptic medication.

*Raboin*, 704 N.W.2d at 769 (citing Minn. Stat. § 253B.092, subds. 5(a), 8(e) ([2014])).

The district court found that the two psychiatrists agreed that "an order imposing treatment with neuroleptic medications is medically indicated and the least restrictive way to treat [appellant] given his mental illness." The testimony quoted above supports this finding.

The district court also found that the petitioner

> opines that given [appellant's] diagnosis; history of improvement when taking other neuroleptic medications at therapeutic doses; his history of decompensation when he is not taking neuroleptic medications in that manner, and his current active psychotic symptoms, [appellant] lacks the capacity to make well-reasoned decisions regarding the administration of neuroleptic medications to treat his mental illness, other than as to the small amount of Seroquel he is willing to take.

The petitioner's testimony supports this finding, and appellant's own testimony supports the petitioner's testimony: appellant testified that he would not take any neuroleptic medication except for the small dose of Seroquel.

The district court found that the petitioner "testified that [appellant] continues to believe in a religion he calls 'Shinto Islam,' which has no inherent connection historically

or by its belief system." Again, the petitioner's testimony and appellant's testimony support this finding. The district court did find that "According to [the petitioner, appellant] is not refusing to take neuroleptic medications due to religious beliefs" while appellant testified that taking neuroleptic medications other than the small dose of Seroquel would be "against [his] religion." But appellant's discussion of his religion in his brief does not argue that the religion forbids the use of chemical substances. He says only that he is

> a holy man of the religion 'Shinto Islam' and my religion is very important and does not allow abuse of chemical substances and any threats would be: "a warning from a man who chooses to believe in Allah" and though my communication skills are complex; other holy men would be in the best position to evaluate my actions and not psychiatry or psychology doctrines.

Appellant says that his religion forbids only the abuse of chemical substances, not their use. In view of the inconsistencies in appellant's arguments, the finding that his religious beliefs are not the basis for his objection to neuroleptic medication is not clearly erroneous.

The district court's findings are not clearly erroneous and provide ample support for its conclusions and the issuing of the *Jarvis* order.

**Affirmed.**